

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CORDES & COMPANY, LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 07 C 3526 |
| THE MITCHELL COMPANIES, LLC, a Florida limited liability company, and GUY MITCHELL, | ) ) ) ) ) | Judge Ruben Castillo |
| Defendants. | ) ) | |

### MEMORANDUM OPINION & ORDER

Cordes & Company, LLC (the "Receiver") was appointed by a Minnesota state court to serve as receiver for a group of entities (the "Receivership Entities") that took millions of dollars from investors whom they have failed to repay. In this action, the Receiver seeks to recover funds that were allegedly fraudulently transferred by two of the Receivership Entities---J&J Investment Properties of Minnesota, LLC ("J&J") and National Real Estate Assignments, LLC ("NREA")---to The Mitchell Companies, LLC ("TMC") and its owner Guy Mitchell ("Mitchell") (collectively "Defendants"). Presently before the Court are the parties' cross-motions for summary judgment. (R. 311, Receiver's Mot. for Summ. J.; R. 314, Defs.' Mot. for Summ. J.) For the following reasons, the motions are granted in part and denied in part.

### RELEVANT FACTS[1]

The Receiver is a limited liability company whose members are citizens of Minnesota and

---

[1] These facts are derived from the parties' statements of facts and exhibits filed in support thereof pursuant to Local Rule 56.1. Unless otherwise indicated, the facts contained herein are undisputed.

Colorado. (R. 321, Defs.' Resp. to Receiver's Facts ¶ 1.) TMC is a Florida limited liability company with its principal place of business in Florida, and Mitchell is a citizen of Florida. (*Id.*) The amount in controversy exceeds $75,000, exclusive of interests and costs. (*Id.*)

### The Investment Program

The genesis of this litigation was a real estate investment program created and implemented by the Receivership Entities. (*Id.* ¶ 8.) Progressive Home Services, Inc. d/b/a Investment Properties of Minnesota ("PHS") served as the "public face" of the Receivership Entities, marketing the programs and soliciting investors. (*Id.*) PHS induced several hundred individuals and small companies to loan or invest in various programs, primarily through real estate investment seminars, and instructed those individuals to make payments to J&J and NREA. (*Id.* ¶ 8.) J&J and NREA are related entities: NREA was owned 100 percent by Joe Cole ("Cole"), and J&J was owned equally by Cole and Jim Abbott ("Abbott"). (*Id.*) A related Receivership Entity, Investment Properties of America, Inc. ("IPA"), was owned on an equal one-third basis by Cole, Abbott, and Nancy Thompson ("Thompson"). (*Id.*)

In marketing its programs, PHS promised investors a significant monetary return on their investments, but those returns never materialized, and investors generally have not recovered their investments. (*Id.*) The Private Loan Program ("PLP") is one example of a real estate investment program sponsored by PHS. (*Id.* ¶ 9.) Individuals participating in the program were generally required to loan at least $25,000 to J&J in exchange for a promissory note in the amount of the investment that would pay the investors between 10 and 30 percent interest. (*Id.*) These promissory notes were issued by J&J and often stated that J&J's obligation to pay principal and interest to the investor was covered under a $25 million insurance policy. (*Id.*)

This representation was false, as no such insurance policy existed. (*Id.*) PHS also represented to investors that their funds would be used to invest in land or real estate developments, and profits from those investments would allow the notes to be paid off, with interest, by a stated maturity date. (*Id.* ¶ 10.) In fact, however, J&J diverted funds from the program for a variety of improper purposes, including making payments to the principals of the Receivership Entities and their affiliates, or making transfers to third parties from whom J&J received nothing in return. (*Id.*) In most cases, J&J's promissory notes to investors remain unpaid. (*Id.*)

### Mitchell & The ROFO Agreement

Mitchell is a Florida real estate developer who in 2005 was working, along with others, to develop hotel unit condominiums in the Hotel 71, located at 71 East Wacker Drive in Chicago. (*Id.* ¶ 6.) During the summer of 2005, the Receivership Entities discussed their potential participation in the Hotel 71 project with Mitchell. (R. 320, Receiver's Resp. to Defs.' Facts ¶ 15.) PHS thereafter marketed units in the Hotel 71 project, along with various other projects, to investors. (R. 321, Defs.' Resp. to Receiver's Facts ¶ 11.) When individual investors were interested in making a reservation deposit or escrow payment related to the purchase of a condominium or some other type of unit in a project that PHS was promoting, PHS typically directed the investor to make payment to NREA. (*Id.*) Instead of using such funds as intended, however, NREA diverted millions of dollars for other purposes, including making transfers to third parties from whom NREA received nothing in return. (*Id.*)

On July 1, 2005, TMC signed a letter of intent with IPA, referred to as the "Agreement Regarding Deposit," regarding the Hotel 71 project. (*Id.* ¶ 19; R. 312-4, Krenn Aff., Ex. I.) The letter of intent indicated that IPA and TMC were negotiating an agreement whereby IPA would

3

acquire 220 condominium units in the Hotel 71 project. (R. 312-4, Krenn Aff., Ex. I.) IPA agreed to deliver $1.7 million to TMC's account as a deposit to be held by TMC while the parties negotiated. (*Id.*) Neither J&J nor NREA signed the letter of intent, nor were they referenced in it. (R. 321, Defs.' Resp. to Receiver's Facts ¶ 19.)

Between July 1 and August 18, 2005, five wire transfers totaling $2.56 million were sent from certain Receivership Entities to the personal bank account of Mitchell. (*Id.* ¶ 12.) The parties dispute precisely which entities sent the transfers: they agree that three of them came from NREA, but bank records appear to conflict on whether the remaining transfers came from J&J or PHS. (*Id.*; R. 317, Krenn Aff., Ex. F.) They do agree that Mitchell spent some of the funds on purposes unrelated to Hotel 71, including monthly payments to Rolls Royce of America. (R. 321, Defs.' Resp. to Receivers Facts ¶ 14.) They also agree that at the time the wire transfers were made, J&J and NREA were both insolvent and lacked the resources to repay their debts. (*Id.* ¶ 17.)

On August 29, 2005, IPA and TMC entered an Agreement regarding an Offer to Purchase units in the Hotel 71 project, known as the "ROFO Agreement." (*Id.* ¶ 21; R. 312-4, Krenn Aff., Ex. J.) Under the ROFO Agreement, IPA agreed to provide 280 purchase agreements for Hotel 71 condominiums by September 13, 2005. (R. 321, Defs.' Resp. to Receiver's Facts ¶ 22.) The ROFO Agreement stated that IPA had already paid TMC $2.2 million, described as the "initial installment" of the "ROFO Payment," and required an additional $600,000 to be paid to TMC by September 1, 2005. (*Id.* ¶¶ 23-24.) Under the terms of the agreement, "The ROFO Payment, or any portion thereof, shall be deemed earned upon receipt and shall be non-refundable in all respects." (*Id.* ¶ 25.) Neither J&J nor NREA are parties to the ROFO Agreement, nor are they

4

referenced in it. (*Id.* ¶ 32.)

Under the ROFO Agreement, TMC had two basic obligations: First, TMC was required to provide condominium disclosure documents; these disclosures were actually provided on August 28, 2005, the day before the agreement was signed. (*Id.* ¶ 27.) Second, once IPA presented the 280 offers to buy, TMC's obligation was to "cause seller to accept the Offer." (*Id.*) The "seller" referenced in the ROFO Agreement was Chicago H&S Hotel Property, LLC. (*Id.* ¶ 28.) Mitchell was the controlling member of Mitchell Hotel Group, LLC, which in turn was the majority owner of Chicago H&S Hotel Property. (*Id.*)

On September 14, 2005, an attorney for TMC wrote a letter to IPA identifying certain defaults by IPA, including its failure to deliver the purchase agreements and the $600,000 final installment of the ROFO Payment, and terminating the ROFO Agreement. (*Id.* ¶ 31.) The letter indicated that TMC would be retaining the $2.2 million of the ROFO Payment previously received. (*Id.*)

### The Minnesota Litigation

In 2006, as a result of litigation initiated by investors in Minnesota state court, the Receiver was appointed to take control of the property belonging to the Receivership Entities (the "Receivership Estate"); administer their assets; analyze their books and records; and pursue claims of fraudulent conveyance and other legal claims the Receivership Entities may have with respect to the property of the Receivership Estate. (R. 321, Defs.' Resp. to Receiver's Facts ¶¶ 3-5.) The Minnesota court also established a procedure via a special master for distributing assets of the Receivership Estate to investors and other creditors of the Receivership Entities. (*Id.* ¶ 4.) The Minnesota court has entered judgment in favor of some of the investors in the amount of

$22.6 million against PHS, J&J, and other Receivership Entities. (R. 312-4, Krenn Aff., Ex. H.) The Minnesota court also pierced the corporate veil of IPA and its affiliates as to owners Abbott and Cole and entered judgment against them personally. (*Id.*)

## PROCEDURAL HISTORY

In June 2007, the Receiver brought this action seeking to void the wire transfers sent from the Receivership Entities to Mitchell, and to require Mitchell to repay the funds to the Receivership Estate. (R. 1, Compl.) In May 2008, the Receiver filed its Second Amended Complaint raising six claims. (R. 298, Sec. Am. Compl.) In Counts I and II, the Receiver seeks to void the transfers under the Uniform Fraudulent Transfer Act ("UFTA"), 740 ILCS 160/5. (*Id.* ¶¶ 27-38.) In Count III, the Receiver raises a claim of unjust enrichment against Defendants. (*Id.* ¶¶ 39-41.) In Count IV, the Receiver seeks rescission of the ROFO Agreement, alleging that it was "a sham agreement which purported to justify the fraudulent transfers referenced in Counts I and II." (*Id.* ¶ 43.) In Count V, the Receiver alleges a claim for conversion of the funds transferred to Mitchell, and in Count VI, the Receiver seeks an accounting from TMC and Mitchell. (*Id.* ¶¶ 46-54.)

The parties have filed cross-motions for summary judgment. (R. 311, Receiver's Mot. for Summ. J.; R. 314, Defs.' Mot. for Summ. J.) The Receiver moves for summary judgment on Counts I and II, arguing that Defendants have no valid defense to the UFTA claims. (R. 313, Receiver's Mem. in Supp. of Mot. for Summ. J. ("Receiver's Mem.") at 1-2.) Defendants, in turn, move for summary judgment in their favor on all six claims, arguing that there is no genuine issue of material fact as to any of these claims, and that they are entitled to judgment as a matter of law. (R. 314, Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") at 1.) In its

6

response brief, the Receiver states that it does not contest entry of judgment for Defendants on the rescission and accounting claims, Counts IV and VI. (R. 319, Receiver's Mem. in Opp. to Defs.' Mot. for Summ. J. ("Receiver's Mem. in Opp.") at 2 n.1.) Accordingly, judgment is entered in Defendants' favor on these counts. That leaves Counts I, II, III, and V remaining.

## LEGAL STANDARDS

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the Court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). Summary judgment is not appropriate if there are disputed issues of fact remaining, or if the court must make "a choice of inferences" arising from undisputed facts. *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003). "The choice between reasonable inferences from facts is a function of a fact-finder, and when multiple reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate." *Id.* When deciding cross-motions for summary judgment, the Court must "construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Amer. Home Assurance Co.*, 400 F.3d 523, 526 (7th Cir. 2005).

## ANALYSIS

### I. Counts I and II: UFTA

In Counts I and II, the Receiver seeks to void the $2.56 million in wire transfers as fraudulent under the UFTA. (R. 298, Sec. Am. Compl. ¶¶ 27-38.) Under the UFTA, there are two types of fraud; actual fraud or "fraud in fact," and constructive fraud or "fraud in law." 740 ILCS §§ 160/5, 160/6; *Wachovia Sec., LLC v. Jahelka*, 586 F. Supp. 2d 972, 1014 (N.D. Ill. 2008). Fraud in fact exists when the debtor has the specific intent to hinder his creditors. *Id.* Fraud in law exists when the debtor conveys assets for inadequate consideration, rendering himself insolvent during a time when he has existing or contemplated indebtedness. *Wachovia*, 586 F. Supp. 2d at 1014. Unlike fraud in fact, fraud in law does not require proof of fraudulent intent. *Soc'y of Lloyd's v. Collins*, 284 F.3d 727, 730 (7th Cir. 2002); *Wachovia*, 586 F. Supp. 2d at 1015. Rather, fraud in law is presumed when the debtor makes a voluntary transfer without consideration or for inadequate consideration, and that transfer hinders or delays the rights of his creditors. *Collins*, 284 F.3d at 730.

Here, the Receiver argues that the wire transfers constituted fraud in law. (R. 313, Receiver's Mem. at 5-11.) Sections 160/5(a)(2) and 160/6(a) of the UFTA set forth the requirements for establishing fraud in law. Under Section 160/5(a)(2), four elements must be present: (1) the transferor made a voluntary transfer; (2) at the time of the transfer, the transferor had obligations elsewhere; (3) the transferor made the transfer without receiving a reasonably equivalent value in exchange; and (4) after the transfer the transferor failed to retain sufficient property to pay his indebtedness. 740 ILCS 160/5(a)(2); *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997). In addition, Section 160/6(a) requires that at the

time of the transfer, the transferor was insolvent or was made insolvent as a result thereof. 740 ILCS 160/6(a); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 77 (Bankr. N.D. Ill. 2002).

Here, the parties agree that J&J and NREA had obligations elsewhere, lacked the resources to repay their debts, and were insolvent at the time of the transfers. (R. 321, Defs.' Resp. to Receiver's Facts ¶ 17.) Their dispute is over whether J&J and NREA received reasonably equivalent value in exchange for the wire transfers to Mitchell's bank account. (*See id.* ¶ 15.) Defendants' view is that TMC "provided sufficient consideration to IPA for the payments made by IPA through its related Receivership Entities." (*Id.*) The Receiver, on the other hand, argue that these entities "received nothing for their transfers," since they are separate legal entities from IPA and were not parties to the ROFO Agreement. (R. 319, Receiver's Mem. in Opp. at 2.) The Receiver further argues that, even if J&J and NREA were somehow construed to be parties to the ROFO Agreement, the ROFO Agreement was an illusory contract under which no value was given by TMC. (*Id.* at 7.)

In determining whether reasonably equivalent value was received under the UFTA, courts consider how that phrase has been construed under the Bankruptcy Code. *In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998); *In re Zeigler*, 320 B.R. 362, 374-75 (Bankr. N.D. Ill. 2005). The Seventh Circuit has held that there is no fixed mathematical formula for determining reasonably equivalent value. *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997). Instead, several factors are considered, including: the fair market value of what was transferred and what was received; whether the transaction took place at arm's length; and the good faith of the transferee. *Id.* Reasonably equivalent value is something more than consideration needed to support a contract. *Worldwide*, 139 F.3d at 580.

9

Whether reasonably equivalent value was received in a transaction is a question of fact. *Id.* at 576; *Wachovia*, 586 F. Supp. 2d at 1015. The party claiming the transaction was fraudulent bears the burden of proof by a preponderance of the evidence that no reasonably equivalent value was received.[2] *Worldwide*, 139 F.3d at 579; *Wachovia*, 586 F. Supp. 2d at 1015; *In re Crystal Med. Prods., Inc.*, 240 B.R. 290, 300 (Bankr. N.D. Ill. 1999). The question, then, is whether the Receiver has come forward with sufficient evidence to prevail on the fraudulent transfer claims, or has at least created material issues of fact sufficient to defeat Defendants' motion for summary judgment on these claims. *See InTrust Corp. v. Fidelity Nat'l Title Ins. Co. of New York*, 577 F. Supp. 2d 1023, 1047 (N.D. Ill. 2008). The Court concludes that summary judgment in favor of either party would be inappropriate on this record.

As an initial matter, there is conflicting evidence regarding precisely which Receivership Entities made the wire transfers. (*See* R. 321, Defs.' Resp. to Receiver's Facts ¶ 12.) It is clear, and Defendants concede, that three of the transfers came from NREA. (*Id.*) However, the records conflict as to whether the remaining two transfers were made by PHS or J&J. The Receiver's expert, Chris D. Schreir, a certified public accountant who has spent more than two years analyzing the financial information and other records of the Receivership Entities, attests that the transfers were made by NREA and J&J. (R. 312-3, Receiver's Facts, Schreier Aff. ¶ 9.) Mitchell's bank records, however, reflect that the transfers were made by NREA and PHS. (R.

---

[2] The Receiver argues that the burden of proof is on Defendants to establish that some reasonably equivalent value was received, citing *In re Nat. Century Fin. Enter., Inc.*, 341 B.R. 198 (Bankr. S.D. Ohio 2006). As stated above, this conflicts with the law of the Seventh Circuit, which is that the party seeking to set aside the transaction bears the burden of proof. *See Worldwide*, 139 F.3d at 579; *see also Barber*, 129 F.3d at 387 ("The burden of proving lack of reasonably equivalent value under § 548 rests on the Trustee.").

10

317, Krenn Aff., Ex. F.) The Court cannot choose between conflicting evidence on a motion for summary judgment. *Harley-Davidson Motor Co., Inc.*, 319 F.3d at 989. The distinction as to which Receivership Entity made the transfers is significant, because if it was PHS and not J&J that made two of the transfers, the Court must determine whether PHS was solvent and able to pay its debts at the time the transfers were made. 740 ILCS §§ 160/5, 160/6. There is no evidence before the Court regarding PHS's solvency, or lack thereof, since the Receiver has been focusing solely on the financials of J&J and NREA. (*See* R. 312-3, Schreir Aff. ¶¶ 9-28.)

Additionally, there is a dispute as to whether the Receivership Entities received reasonably equivalent value in exchange for the wire transfers. The Receiver is correct that the debts of affiliated corporations are ordinarily not enforceable against each other, *see In re Xonics Photochemical*, 841 F.2d 198, 201 (7th Cir. 1988), such that NREA and J&J (or PHS) would have had no legal obligation to transfer the funds based on the obligations of its affiliated entity, IPA, under the ROFO Agreement. However, whether these Receivership Entities received some type of "indirect" benefit from the transfers must also be considered in assessing whether reasonably equivalent value was received. *Worldwide*, 139 F.3d at 578. Indirect benefits can include a wide range of intangibles such as a corporation's goodwill or increased ability to borrow working capital; the general relationship between affiliates or "synergy" within a corporate group as a whole; or a corporation's ability to retain an important source of supply or an important customer. *See id.* at 578-79; *see also In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1127 (5th Cir. 1993) (corporation's ability to keep affiliated corporation in operation was an indirect benefit constituting reasonably equivalent value); *Mellon Bank N.A. v. Metro Comms., Inc.*, 945 F.2d 635, 646-48 (3d Cir. 1991) (indirect benefits of corporate goodwill and ability to

obtain credit must be considered in assessing reasonably equivalent value). The Receiver fails to consider this aspect of reasonably equivalent value when arguing that the Receivership Entities received no value in exchange for the wire transfers.[3]

Defendants, for their part, simply ignore the legal distinction between IPA and the other Receivership Entities. (*See* R. 314, Defs.' Mem. at 2.) Indeed, Defendants entire motion reads as if it were IPA itself that made the wire transfers. For instance, Defendants characterize the dispute in this case as follows: "The Receiver alleges that the payments made by IPA to TMC were fraudulent transfers . . . ." (*Id.*). In fact, the Receiver makes no such claim, since the wire transfers in question were made by Receivership Entities *other* than IPA. Defendants argue at length that IPA received a benefit under the ROFO Agreement based on risks assumed by TMC in that agreement, but again they fail to recognize that only IPA was a party to the ROFO Agreement; the other Receivership Entities had no legal obligation to make payments under the Agreement. (*See* R. 314, Defs.' Mem. at 4-7.) Defendants suggest that IPA "caused" the other Receivership Entities to make the transfers, but the Receiver disputes this, and there is no evidence in the record to support Defendants' assertion. (*See* R. 320, Receiver's Resp. to Defs.' Facts ¶¶ 18-21.) The only evidence Defendants cite in support of this assertion is Paragraph 17 of the Receiver's Second Amended Complaint, which in fact makes no mention of IPA having

---

[3] In a somewhat confusing argument, the Receiver asserts that the only basis for finding some value to the Receivership Entities would be if Defendants could convince the Court to pierce the corporate veils of IPA, J&J, and NREA. (R. 319, Receiver's Mem. in Opp. at 6 ("In order to show that value provided to IPA constituted value to J&J and NREA, Defendants would need to have this Court disregard the legal status of J&J and NREA and then 'reverse pierce' to establish that the benefit to IPA gives value to J&J and NREA."). Defendants have not asked the Court to pierce the corporate veil, and so the Court declines to give this matter further consideration. Similarly, Defendants have not raised the defense of *in pari delicto*, also discussed by the Receiver. (*See id.* at 11-12.)

"caused" these transfers to be made. (*See* R. 298, Sec. Am. Compl. ¶ 17.)

Given the apparent close affiliation of these entities with IPA, they may have received some indirect benefit such as goodwill or overall synergy of the corporate group as a result of the transfers. However, whether they received such a benefit cannot be determined on this record, and must instead be determined by the trier of fact. *See Worldwide,* 139 F.3d at 576 (whether reasonably equivalent value was received is a question of fact); *see also Am. Nat'l Bank & Tr. Co. of Chicago v. ALPS Elec. Co., Ltd.,* No. 99 C 6990, 2002 WL 484849, at *23 (N.D. Ill. Mar. 29, 2002) (denying summary judgment in fraudulent conveyance case because disputed issue of fact existed as to whether reasonably equivalent value was received); *Mann v. Hanil Bank,* 920 F. Supp. 944, 953-54 (E.D. Wis. 1996) (denying summary judgment in fraudulent conveyance case where defendant argued that transferor received indirect benefit by paying debts of its sister corporation, since issue had to be decided by trier of fact).

For these reasons, the parties' cross-motions for summary judgment on Counts I and II are denied.

## II. Count III

In Count III, the Receiver asserts a claim for unjust enrichment against Defendants. (R. 298, Sec. Am. Compl. ¶¶ 39-41.) Unjust enrichment is a "quasi-contract" theory that permits courts to imply the existence of a contract where none exists in order to prevent unjust results. *Hayes Mech., Inc. v. First Indus., LLP,* 812 N.E.2d 419, 426 (Ill. App. Ct. 2004). To succeed on a claim for unjust enrichment, the plaintiff must show that the defendant retained a benefit to the plaintiff's detriment, and that the retention of that benefit violates fundamental principles of justice, equity, and good conscience. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.,* 545

N.E.2d 672, 679 (Ill. 1989). When two parties' relationship is governed by a contract, they may not bring a claim for unjust enrichment. *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004). "The reason for prohibiting a claim of unjust enrichment between contracting parties is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract." *Id.*

Defendants argue that they are entitled to summary judgment on the unjust enrichment claim because the parties' relationship is governed by the ROFO Agreement. (R. 314, Defs.' Mem. at 6.) Specifically, Defendants argue: "IPA and TMC entered a valid agreement, the ROFO Agreement, which set forth the parties respective positions," and that the Receiver cannot use a claim for unjust enrichment "to reverse a valid business deal." (*Id.*) Once again, Defendants have ignored the fact that the Receivership Entities sending the wire transfers were not parties to the ROFO Agreement. Because there is no contract governing the relationship between J&J, PHS, NREA and Defendants, the unjust enrichment claim is not barred.[4]

## III.  Count V

In Count V, the Receiver alleges a claim for conversion, seeking return of the $2.56 million in wire transfers from Defendants. (R. 298, Sec. Am. Compl. ¶¶ 46-50.) "Conversion" is the unauthorized assumption of the right to possession or ownership of personal property belonging to another. *Fortech, LLC v. R.W. Dunteman Co., Inc.*, 852 N.E.2d 451, 456 (Ill. App. Ct. 2006). To recover for conversion under Illinois law, the plaintiff must show: (1) he has an

---

[4] Because the Receivership Entities sending the wire transfers were not parties to the ROFO Agreement, the Court does not reach the Receiver's alternative argument that the ROFO Agreement is unenforceable because the consideration provided by TMC was illusory. (*See* R. 319, Receiver's Mem. in Opp. at 7-10.)

absolute and unconditional right to the property at issue; (2) he made a demand for possession of the property; and (3) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005); *Fortech*, 852 N.E.2d at 456.

Defendants argue that they cannot be liable for conversion because the wire transfers were voluntarily made by the Receivership Entities. (R. 314, Defs.' Mem. at 9.) The Court agrees that the tort of conversion does not fit with the facts of this case. There is no dispute here that the wire transfers were voluntarily made to Mitchell's bank account by the Receivership Entities. There can be no wrongful assertion of dominion and control, and thus no conversion, when property is voluntarily transferred to the defendant by the owner. *In re Alper-Richman Furs, Ltd.*, 147 B.R. 140, 151 (Bankr. N.D. Ill. 1992); *General Motors Corp. v. Douglass*, 565 N.E.2d 93, 100 (Ill. App. Ct. 1990). In other words, Defendants cannot have "converted property which was voluntarily given to [them] in the first instance." *Douglass*, 565 N.E.2d at 100. Accordingly, summary judgment is granted in favor of Defendants on Count V.

As a final matter, Mitchell seeks to be dismissed as a Defendant from this case, arguing that he was not a party to the ROFO Agreement and instead only signed on TMC's behalf. (R. 314, Defs.' Mem. at 10.) The Court rejects this argument. Mitchell admits that the wire transfers at issue were made to his personal bank account, and that he has spent some of the funds on personal expenses unrelated to the Hotel 71 project. (R. 321, Defs.' Resp. to Pl.'s Facts ¶¶ 13-14.) If the transfers are voided under the UFTA, Mitchell would be a proper Defendant from which to seek reimbursement. *See* 740 ILCS 160/9(b) ("[J]udgment may be entered against the first transferee of the asset or the person for whose benefit the transfer was made.").

15

Accordingly, Mitchell's request to be dismissed from this lawsuit is denied.

## CONCLUSION

For these reasons, the parties' cross-motions for summary judgment (R. 311, 314) are granted in part and denied in part. Judgment is entered in favor of Defendants on Counts IV, V, and VI. The motions are denied in all other respects.

The parties are directed to reevaluate their settlement positions in light of this opinion and to fully exhaust all efforts to settle this case. The parties shall appear for a status hearing on **April 2, 2009** at **9:45 a.m.** to set a firm trial date for this lawsuit.

Entered: _____
Judge Ruben Castillo
United States District Court

**Dated: March 24, 2009**